## IN THE COURT OF APPEALS OF IOWA

No. 14-1449
Filed December 9, 2015

**STATE OF IOWA,**
          Plaintiff-Appellee,

**vs.**

**BENJAMIN ELLIOTT LANE,**
          Defendant-Appellant.
_____

          Appeal from the Iowa District Court for Black Hawk County, Todd A. Geer,

Judge.


          Defendant appeals his convictions for first-degree burglary and second-

degree sexual abuse.  **AFFIRMED.**


          Benjamin Bergmann of Parrish, Kruidenier, Dunn, Boles, Gribble, Gentry,

Brown & Bergmann, L.L.P., Des Moines, for appellant.

          Thomas J. Miller, Attorney General, Kevin Cmelik and Heather Ann

Mapes, Assistant Attorneys General, for appellee.


          Considered by Doyle, P.J., and Mullins and Bower, JJ.

**BOWER, Judge.**

Defendant Benjamin Lane appeals his convictions for first-degree burglary and second-degree sexual abuse. Lane claims the district court improperly denied his motion to suppress and there was insufficient evidence to support the convictions. We find the district court properly denied Lane's motion to suppress based on his claims (1) he was denied his rights under Iowa Code section 804.20 (2013) because he was not permitted to see his mother; (2) he did not knowingly and intelligently waive his *Miranda* rights; and (3) he did not knowingly, voluntarily, and intelligently consent to a search of his person. We also find there was sufficient evidence in the record to show (1) Lane broke into the residence; (2) he did not have permission or authority to enter the residence; (3) he was armed with a dangerous weapon; and (4) while committing sexual abuse he used or threatened to use force creating a substantial risk of death or serious injury. We affirm his convictions.

## I.    Background Facts & Proceedings

Lane was a tenant at a house in Cedar Falls, Iowa, where the tenants shared common areas, but each had a private bedroom. Prior to September 2013, Lane left that residence and moved in with his parents. Although he was to give the key to the house back to the owners when he moved out, he did not do so. After Lane moved out, J.C. became a tenant at the house. She was not acquainted with Lane.

On September 26, 2013, one of the tenants, Jayden Johnson, invited Lane over to the house. Lane and Johnson spent several hours playing

computer games in the common area of the house. Lane left at about 1:00 a.m. on September 27, 2013, and Johnson then locked the front door.

J.C. testified that in the early morning hours of September 27, 2013, a man wearing a ski mask and dark clothing opened the door to her bedroom and came in. The intruder displayed a knife and said, "If you scream, I'll kill you." He put the knife against her arm and stated he would cut her throat. He put duct tape over her mouth, took off her clothing, and slapped her breasts repeatedly. He put his finger and hand in her vagina and a finger in her anus. He placed a hand on her neck in a choking fashion. When the man left, J.C. looked out her window and saw the taillights of a Ford Mustang. She remembered she had seen a Ford Mustang parked outside the house earlier in the day.

J.C. asked one of her roommates to call 911. She informed Johnson she believed the intruder had been his friend, who he identified as Lane. J.C. was bleeding quite profusely as a result of the assault. She was taken by ambulance to the hospital, where she required surgery to repair her injuries.

Officers went to the home of Lane's parents on the morning of September 27, 2013, requesting Lane come to the Cedar Falls Police Department to be interviewed. Lane's mother, Pamela Lane, drove him to the police station. Lane was taken to an interview room, where he was informed he was free to leave at any time, and he retained possession of his cell phone throughout the interview. He initially denied going back to the house after playing computer games. The officers observed dried blood on Lane's knee. He consented to a search of his person, including a sample of the dried blood.

When officers requested consent to search his vehicle, Lane stated he felt like he was being forced, but agreed. The car was registered to Pamela and he said, "Go talk to my mom." Pamela told officers they would need a search warrant, so officers began the process to obtain search warrants for Lane's person, the car, and his house. At that time Lane was told he was in custody and no longer free to leave. The officers informed Lane of his *Miranda* rights. He was left alone in the interview room.

Lane told an officer he wanted to speak to his mother. He was informed Pamela had gone home. Although he was still in possession of his cell phone, he did not attempt to call her, nor did he ask the officers if he could call his mother from a police telephone. A few seconds later, he summoned an officer and said, "I did it." He gave a detailed confession to the offenses. Lane told the officers of the location of the knife, ski mask, duct tape, and clothing he had been wearing. He stated he entered the residence with a key he had retained.

The officers obtained search warrants for Lane's person, vehicle, and home. They took a new sample of the blood on Lane's knee. In searching Lane's home, the officers found the items used in the offenses in the areas where Lane said they would be located. J.C.'s blood was found on the knife, the duct tape, Lane's pants, his sock, and his knee.

Lane was charged with burglary in the first degree, in violation of Iowa Code section 713.3, and sexual abuse in the second degree, in violation of section 709.3. Lane filed a motion to suppress, claiming (1) he was denied his rights under section 804.20 because he was not permitted to see his mother; (2)

he did not knowingly and intelligently waive his *Miranda* rights; and (3) he did not knowingly, voluntarily, and intelligently consent to a search of his person.

After a hearing, the district court denied the motion to suppress. The court found Lane had not been denied his rights under section 804.20. The court determined the *Miranda* warning was properly administered, and Lane understood and acknowledged those rights. The court additionally concluded Lane voluntarily consented to a search of his person.

Lane requested a bench trial. The district court found Lane guilty of first-degree burglary and second-degree sexual abuse. The court specifically found, "J.C.'s testimony was highly credible." The court found the knife used by Lane was a dangerous weapon because he actually used it in such a manner as to indicate he intended to inflict death or serious injury upon another person, and the knife was clearly capable of inflicting death when used as intended. The court also found Lane broke into the residence, even though he used a key, because he did not have the right or privilege to enter the home at that time, and his use of the key was unauthorized. Furthermore, he did not have permission or authority to enter J.C.'s bedroom.

Lane was sentenced to a term of imprisonment not to exceed twenty-five years on each offense, to be served consecutively. He now appeals.

## II. Motion to Suppress

**A.** Lane contends the district court should have granted his motion to suppress his statements to officers because he was denied his right under section 804.20 to consult a family member. He asserts that when he asked to

see his mother officers should have done more to facilitate his request. He states that rather than merely stating his mother was no longer at the police station, the officer should have taken some affirmative action to ensure he was able to speak to his mother. He states the officer should have informed him he could call her. He also points out it would not have taken her long to return to the station, where he could see her as he requested.

Section 804.20 provides:

> Any peace officer or other person having custody of any person arrested or restrained of the person's liberty for any reason whatever, shall permit that person, without unnecessary delay after arrival at the place of detention, to call, consult, and see a member of the person's family or an attorney of the person's choice, or both.

We first determine whether a defendant has invoked his rights under section 804.20. *State v. Hicks*, 791 N.W.2d 89, 94 (Iowa 2010). We then consider whether the defendant was afforded the rights guaranteed by section 804.20. *Id.* We review the district court's ruling for the correction of errors at law. *State v. Moorehead*, 699 N.W.2d 667, 671 (Iowa 2005).

Lane asked an officer, "Can I see my mom, please?" This invoked his rights under section 804.20. "[O]nce section 804.20 is invoked the peace officer must provide the detainee 'with a reasonable opportunity' to contact a family member or attorney." *Hicks*, 791 N.W.2d at 96 (citation omitted). "We hold that once section 804.20 is invoked, the detaining officer must direct the detainee to the phone and invite the detainee to place his call or obtain the phone number from the detainee and place the phone call himself." *Id.* at 97. On appeal, the State concedes that in order to fulfill the requirements of section 804.20, the

officer should have advised Lane of his right to call his mother or given him an opportunity to see her.

In general, if a defendant's rights pursuant to section 804.20 have been violated, evidence obtained as a result of the violation should be excluded. *See State v. Vietor*, 261 N.W.2d 828, 832 (Iowa 1978). However, if a defendant's statement "was spontaneous, the statement should be admitted into evidence because the exclusion of such statements is not implicated by a violation of Iowa Code section 804.20." *Moorehead*, 699 N.W.2d at 675. When a defendant's statement is spontaneous, the *Vietor* exclusionary rule does not apply. *Id.*; *see also State v. Garrity*, 765 N.W.2d 592, 597 (Iowa 2009) ("The exclusionary rule extends to . . . non-spontaneous statements obtained after unnecessary delay in allowing the person the statutory right to consult with an attorney or family member.").

The district court found, "It is also important to note that it was the defendant who initiated the contact with law enforcement to give his confession and that his confession was given spontaneously and voluntarily rather than as a result of law enforcement questioning." We find no error in the court's conclusion Lane's statements were given spontaneously. Lane was alone in the interview room when he indicated he wanted to speak to an officer. The officer did not ask him any questions at that time. Lane told the officer, "I did it" and gave a detailed confession to the offenses. Because Lane's statements were spontaneous, the exclusionary rule does not apply. *See Moorehead*, 699 N.W.2d at 675. We

conclude the district court properly denied Lane's motion to suppress based on his claims under section 804.20.

**B.** Lane asserts the district court should have granted his motion to suppress because the waiver of his *Miranda* rights was not knowing, voluntary, and intelligent. He claims the waiver was not valid because he was particularly vulnerable to the influence of law enforcement and the waiver was obtained under intimidating circumstances.[1]

The State has the burden to prove by a preponderance of the evidence that a defendant knowingly and intelligently waived his *Miranda* rights. *State v. Harris*, 741 N.W.2d 1, 6 (Iowa 2007).

> To determine whether a suspect's waiver of his or her *Miranda* rights was knowing and intelligent, we must inquire if the suspect knew that he or she did not have to speak to the police without counsel and understood that statements provided to the police could be used against him or her.

*State v. Ortiz*, 766 N.W.2d 244, 252 (Iowa 2009). Our review on this constitutional issue is de novo. *State v. Short*, 851 N.W.2d 474, 478 (Iowa 2014). "[W]e give deference to the factual findings of the district court due to its opportunity to evaluate the credibility of the witnesses, but are not bound by such findings." *State v. Lane*, 726 N.W.2d 371, 377 (Iowa 2007).

An officer verbally informed Lane of his *Miranda* rights at the time he was told he was no longer free to leave the police station. The officer stated, "Do you

---

[1] Lane also claims he should have been given a written waiver form. There is no requirement a defendant be given a written waiver form. "*Miranda* warnings may be orally transmitted to a subject in custody and the waiver of rights attendant thereto may be oral or may be inferred from the facts." *State v. Bowers*, 656 N.W.2d 349, 353 (Iowa 2002).

understand?" and Lane replied, "Yep." Lane was then left alone in the interview room for a period of time. He was not questioned by the officers after he was informed of his rights. After a period of time, Lane asked to speak to his mother. Shortly after that he told an officer "I did it" and gave a detailed confession to the offenses.

At the suppression hearing, Pamela testified Lane "struggled a lot in school," needing speech therapy and occupational therapy. He was a high school graduate. Pamela stated Lane was nonassertive and nonconfrontational. Lane was twenty-one years old at the time, just ten days away from turning twenty-two. He had no previous criminal record, except for a speeding ticket.

The district court determined:

> Defendant's *Miranda* warning was properly administered. There is nothing in the record to suggest that defendant did not understand his rights. Defendant was not subject to custodial interrogation. Rather, defendant subsequently confessed without prompting by law enforcement in any way. Defendant's statements were "freely volunteered without compelling influences."

(Citation omitted.)

We agree with the district court's conclusion. Lane's statements were not due to the influence of officers, nor were they obtained under intimidating circumstances, because Lane was alone in a room, not subject to interrogation, approached an officer, and made incriminating statements. We determine the district court properly denied Lane's motion to suppress on this issue.

**C.** Lane claims he did not knowingly, voluntarily, and intelligently consent to a search of his person. Lane asserts officers obtained DNA samples from his person, including a sample of the dried blood on his knee, without

obtaining a valid consent. He states his consent was the result of duress or coercion. Lane points out that he consented to a search of his person prior to being informed of his *Miranda* rights.

In general, a warrantless search is considered to be per se unreasonable under the Fourth Amendment. *State v. Lowe*, 812 N.W.2d 554, 568 (Iowa 2012). One of the exceptions to the warrant requirement are searches based on consent. *Id.* "[T]he validity of a consent to search is whether the consent was voluntarily given and not a result of duress or coercion, express or implied." *State v. Pals*, 805 N.W.2d 767, 777 (Iowa 2011). We consider a defendant's characteristics,

> such as age, education, intelligence, sobriety, and experience with the law; and features of the context in which the consent was given, such as the length of detention or questioning, the substance of any discussion between the [consenter] and police preceding the consent, whether the [consenter] was free to leave or was subject to restraint, and whether the [consenter's] contemporaneous reaction to the search was consistent with consent.

*Lane*, 726 N.W.2d at 378.

Whether a defendant's consent is voluntary is a question of fact, to be determined from all the circumstances. *Pals*, 805 N.W.2d at 777. It is the State's burden to show consent was voluntary. *Lane*, 726 N.W.2d at 378. Again, our review on this constitutional issue is de novo. *Short*, 851 N.W.2d at 478.

Officers went to the home of Lane's parents on the morning of September 27, 2013, at about 5:41 a.m.[2] Lane's mother, Pamela, answered the door, and they told her they needed to speak to Lane. Pamela woke him up, and he met

---

[2] There was evidence Lane worked a "third-shift type schedule," where he often stayed up until 5:00 or 6:00 a.m. and then slept into the afternoon.

the officers on the front porch. The officers told Lane there had been an incident at his former residence and asked him to come to the police station for an interview. Lane asked if he could talk to them at his house, but the officers stated they preferred for him to come to the station, and he agreed. Pamela drove him to the police station.

At the station, Pamela asked if she could accompany Lane, but because he was an adult, the officers stated they would speak to him alone. Lane was taken to an interview room, where he was informed he was free to leave at any time. He retained possession of his cell phone throughout the interview. The interview was described as "cordial," and "[j]ust normal conversation," by the two officers conducting the interview. Lane responded appropriately to the officers' questions. The interview was videotaped.

Lane was wearing shorts, and the officers observed dried blood on his knee. The officers asked to take a sample of the blood and to take a swab of the inside of Lane's mouth (to obtain a sample of his DNA). Lane was informed he had the option to refuse to give his consent. Lane said, "I guess so." He then signed a written consent form. The written form states, "I have been informed of my rights under the Fourth Amendment of the Constitution of the United States of America, which states that I am secure from an unreasonable search and seizure."

The district court found:

> In obtaining consent, there is nothing in the record which would indicate that defendant was threatened in any way to provide consent. No promises of leniency or promises of any kind were made to the defendant to obtain his consent. Examining the totality

of the circumstances, in light of all of the evidence presented at hearing, the court concludes that the consent was given freely, knowingly, intelligently, and voluntarily. Defendant was specifically informed that he did not have to consent.

On our de novo review, we agree with the district court's conclusions. After examining the totality of the circumstances, we conclude the State met its burden to show Lane's consent to a search of his person was voluntary. The evidence does not support Lane's claim he was subjected to duress or coercion. Lane was twenty-one years old and had a high school education. He had been questioned for about one hour and twenty minutes when he consented to the search. There is no evidence the officers engaged in aggressive or intimidating tactics or that they improperly made promises of leniency. Lane was specifically informed he was free to leave the interview room at any time and he was free to withhold his consent to the search. We affirm the district court's decision denying Lane's motion to suppress on the ground he did not knowingly, voluntarily, and intelligently consent to a search of his person.[3]

## III.    Sufficiency of the Evidence

**A.**    Lane contends there is insufficient evidence in the record to support his conviction for first-degree burglary. He asserts the State did not present sufficient evidence to show he broke into the residence. He states the term "break" implies damage or improper force. Lane claims he did not "break" into the residence because he used a key and did not use improper force or cause any damage.

---

[3] Because we have affirmed based on the district court's ruling that Lane voluntarily consented to a search of his person, we do not address the State's alternative arguments based on the inevitable discovery doctrine.

We review a challenge to the sufficiency of the evidence for the correction of errors at law. *State v. Keopasaeuth*, 645 N.W.2d 637, 639-40 (Iowa 2002). "The court views the evidence in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence." *Id.* at 640. A verdict will be upheld if it is supported by substantial evidence. *State v. Sanford*, 804 N.W.2d 611, 615 (Iowa 2012). "Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *Id.* We consider all of the evidence in the record not just the evidence supporting the verdict. *State v. Dalton*, 674 N.W.2d 111, 116 (Iowa 2004).

> The trial information alleged that Lane committed first-degree burglary by:
>
> Having the intent to commit a felony or assault therein and having no right, license, or privilege to do so breaks an occupied structure in which one or more persons are present and has possession of a dangerous weapon or performs or participates in a sex act constituting sexual abuse.

The definition of burglary in section 713.1 applies to a person having the intent to commit a felony, assault, or theft who enters an occupied structure or who breaks an occupied structure. The trial information in this case only refers to the alternative of a person "who breaks an occupied structure." *See* Iowa Code § 713.1.

The meaning of the term "breaking" was discussed in *State v. Houghland*, 197 N.W.2d 364, 365 (Iowa 1972), where the court stated, "'Breaking' means making an opening into a building by trespass and occurs when an intruder removes or puts aside some part of the structure relied on as an obstruction to

intrusion. Opening an entrance door is a breaking." *See also State v. Clay*, 213 N.W.2d 473, 480 (Iowa 1973) (quoting *Houghland*, 197 N.W.2d at 365). "Breaking" has also been defined as "the act of entering a building without permission." *State v. McCall*, 754 N.W.2d 868, 873 (Iowa Ct. App. 2008) (quoting Black's Law Dictionary 201 (8th ed. 2004)).

We determine there is substantial evidence in the record to support the district court's conclusion, "Defendant clearly removed and put aside obstructions to enter the front doorway of [the residence] and the doorway to J.C.'s private room at that address." Lane opened the entrance door to the residence and the entrance door to J.C.'s bedroom. There is sufficient evidence in the record to show Lane broke into an occupied structure.

**B.** Lane claims there is insufficient evidence in the record to show he did not have permission or authority to enter the residence. He states he had a "blanket privilege" to enter the residence. He asserts other tenants knew he still had a key and continued to use it. He also states it was common for him to enter the house without asking for permission.

As an element of burglary, the State must prove a defendant did not have the right, license, or privilege to enter a structure. *State v. Franklin*, 368 N.W.2d 716, 718 (Iowa 1985). A person does not commit burglary "if the person entering has a right to do so, although he may intend to commit, and may actually commit, a felony." *State v. Peck*, 539 N.W.2d 170, 173 (Iowa 1995). A defendant does not commit burglary if the residents of a house acquiesce to the defendant's presence or give him implied consent to enter. *State v. King*, 344 N.W.2d 562,

563 (Iowa Ct. App. 1983). A person who has a general right of entry, however, may be guilty of burglary "if he exceeds his rights either with respect to the time of entering or the place into which he enters." *Peck*, 539 N.W.2d at 173.

Only one of the tenants at the residence, Johnson, was aware Lane still had a key to the residence, and he had never seen Lane use it. Johnson testified Lane came over when he was invited, and he did not have any right or authority to be in the house on his own. The evidence shows Lane did not have a general right of entry to the residence, except when he was specifically invited over. Even if Lane had a general right of entry to the common areas of the residence, he did not have the right to enter the bedrooms of the tenants, which they uniformly testified were considered private. Furthermore, J.C. specifically testified Lane did not have permission to enter her bedroom. On cross-examination Lane also stated he did not have the right to ever go into J.C.'s personal bedroom. We find there is sufficient evidence in the record to show Lane did not have the right, license, or privilege to enter the residence or J.C. private bedroom.

**C.** Lane asserts there is insufficient evidence in the record to show he was armed with a dangerous weapon. The information alleged Lane committed first-degree burglary under section 713.3(1)(b) ("The person has possession of a dangerous weapon.") or 713.3(1)(d) ("The person performs or participates in a sex act with any person which would constitute sexual abuse."). The trial information also alleged Lane committed second-degree sexual abuse under section 709.3(1) ("During the commission of sexual abuse the person displays in

a threatening manner a dangerous weapon, or uses or threatens to use force creating a substantial risk of death or serious injury to any person."). Lane claims there is insufficient evidence to show he used the knife in a manner to indicate he intended to inflict death or serious injury upon another.

The term "dangerous weapon" is defined in section 702.7:

> A *"dangerous weapon"* is any instrument or device designed primarily for use in inflicting death or injury upon a human being or animal, and which is capable of inflicting death upon a human being when used in the manner for which it was designed, . . . . Additionally, any instrument or device of any sort whatsoever which is actually used in such a manner as to indicate that the defendant intends to inflict death or serious injury upon the other, and which, when so used, is capable of inflicting death upon a human being, is a dangerous weapon.

The parties agree the knife used in this case did not have a blade exceeding five inches in length, and therefore, was not a dangerous weapon per se. *See* Iowa Code § 702.7.

The State asserts there was substantial evidence in the record to show Lane actually used the knife in a manner so as to indicate he intended to inflict death or serious injury upon J.C., and the knife was capable of inflicting death upon a human being. "[A]n accused satisfies this definitional requirement when the accused objectively manifests to the victim his or her intent to inflict serious harm upon the victim." *State v. Ortiz*, 789 N.W.2d 761, 767 (Iowa 2010). "[A] defendant objectively indicates intent to inflict harm when the defendant engages in a personal confrontation with another while possessing an instrument capable of causing bodily harm." *Id.*

The knife used by Lane was nine inches long, with a blade four and one-eighth inches long. Lane stated he brought the knife to J.C.'s bedroom because he wanted to scare her. When he entered the room, he told J.C., "If you scream, I'll kill you," and held the knife against her arm. He continued to hold the knife to her as he tore off her shirt and slapped her breasts. J.C. told a nurse Lane told her, "he would cut her or harm her if she would move or scream and the threat was to cut her throat." We conclude there is substantial evidence in the record to show Lane objectively manifested to J.C. his intent to inflict serious harm upon her. *See id.* This satisfied the definitional requirement to show he actually used the knife in a manner to indicate he intended to inflict death or serious injury upon another. *See id.* Lane does not dispute the knife was capable of inflicting death upon a human being. We conclude there is substantial evidence to show Lane was armed with a dangerous weapon.

**D.** Finally, Lane claims there is not sufficient evidence in the record to show he used or threatened to use force creating a substantial risk of death or serious injury. He asserts he did not use sufficient force to create a substantial risk of death or serious injury. He states that while J.C. was injured, she was able to be treated and she healed completely.

Under section 709.3(1), a person commits sexual abuse in the second degree when "During the commission of sexual abuse the person displays in a threatening manner a dangerous weapon, or uses or *threatens to use* force creating a substantial risk of death or serious injury to any person." (Emphasis added.) "Violations of section 709.3 include acts of sexual abuse where the

person displays a dangerous weapon, or uses or threatens force creating a substantial risk of death or serious injury to any person." *State v. Oliver*, 812 N.W.2d 636, 641 (Iowa 2012). There is no requirement that the defendant actually causes death or serious injury to the victim. *State v. Taylor*, 538 N.W.2d 314, 315-16 (Iowa Ct. App. 1995).

The evidence shows that while displaying a knife, Lane threatened to kill J.C. There was also evidence he threatened "he would cut her or harm her if she would move or scream and the threat was to cut her throat." Thus, there is substantial evidence to show he threatened to use force creating a substantial risk of death or serious injury.

We affirm Lane's convictions.

**AFFIRMED.**